**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **DEBORAH HALL,** | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Civil Action No. 3:10-CV-1713-BH |
| | § | |
| **MICHAEL J. ASTRUE,** | § | |
| **Commissioner of Social Security,** | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Pursuant to the consent of the parties and the order of transfer dated November 2, 2010, this case has been transferred for the conduct of all further proceedings and the entry of judgment. Before the Court are *Plaintiff's Motion for Summary Judgment*, filed November 29, 2010, and *Defendant's Motion for Summary Judgment*, filed January 25, 2011. Based on the relevant filings, evidence, and applicable law, Plaintiff's motion is **DENIED**, Defendant's motion is **GRANTED,** and the final decision of the Commissioner is wholly **AFFIRMED**.

### I. BACKGROUND[1]

**A.    Procedural History**

Deborah Hall ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her claim for disability benefits under Title XVI of the Social Security Act. Plaintiff applied for supplemental security income on November 4, 2005, alleging disability since January 1, 2005, due to schizoaffective disorder, depression, and back

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "R."

problems. (R. at 70-75.) Her application was denied initially and upon reconsideration. (R. at 40, 48.) She timely requested a hearing before an Administrative Law Judge ("ALJ") and personally appeared and testified at a hearing held on February 25, 2008. (R. at 37, 432-57.) On August 28, 2008, the ALJ issued a decision finding Plaintiff not disabled. (R. at 17-27.) Plaintiff then submitted additional evidence to the Appeals Council and requested a review of the ALJ's decision. (R. at 7, 15-16.) On July 22, 2010, the Appeals Council denied her request for review and the ALJ's decision became the final decision of the Commissioner. (R. at 3-5.) Plaintiff timely appealed the decision to the United States District Court pursuant to 42 U.S.C. § 405(g).

**B.     Factual History**

    **1.     Age, Education, and Work Experience**

Plaintiff was born on October 6, 1960, was 44 years old on her alleged onset date, and was 45 years old at the time of her application. (R. at 81.) She has a ninth grade education and has no past relevant work. (R. at 26, 435.)

    **2.     Medical Evidence**

In February of 2005, Plaintiff visited Dallas Metrocare Services ("Dallas Metrocare") and reported visual and auditory hallucinations, depression, feelings of worthlessness and hopelessness, excessive guilt, decreased energy, and suicidal and homicidal thoughts. (R. at 195-202.) She stated that she had heard voices since junior high school and currently saw shadows that touched her and heard voices that told her to hurt herself and others. (R. at 203, 306.) She was diagnosed with schizoaffective disorder, cocaine dependence, cannabis dependence, and alcohol dependence, and started on antidepressants, including Celexa and Trazadone. (R. at 204-05.)

In April, Plaintiff visited Dallas Metrocare again and reported depression, hearing voices and

feeling paranoid as her main concerns. (R. at 301.) She stated that she had mood swings and despite trying to walk away, she was "going off on someone" most of the time. (R. at 298.) She had no income and was living with her daughter. (R. at 301.) During the visit, a physician advised her not to work. (*Id.*)

In August, Plaintiff saw Gretchen Megowen, M.D., at Dallas Metrocare. (R. at 290, 293.) She reported that she wished to isolate herself, felt depressed and irritable, was not sleeping, and had temper issues that had gotten better in the past with medication. (R. at 291.) She explained that she felt better after she started taking medication in December 2004 and April 2005, but discontinued it and had returned to get medication again. (*Id.*) Her medical assessment was decompensation, off medication. (R. at 292.)

In September, Plaintiff told Phillip Balleza, M.D., at Dallas Metrocare that she now understood that compliance with her medications allowed her to function and cope with her stress better. (R. at 287, 289.) She reported hearing voices every now and then, but less than when she stopped taking her medications. (R. at 287.) She reported taking care of her grandchild three days a week for about eight hours and complained of feeling tired. (*Id.*) Dr. Balleza noted that she was anemic and encouraged her to eat appropriately and to take a multivitamin with iron. (*Id.*)

In December, Plaintiff reported to Kevin R. Johnson, P.A., at Dallas Metrocare that she felt depressed one to two days a week, but denied any paranoia. (R. at 283, 285.) She reported visual hallucinations of a man and a woman in a white gown and voices occasionally telling her that she needed to die and to "look at that B—, she better than us." (R. at 283.) She was assessed as having continued psychosis and insomnia and advised to restart Restoril and increase Loxitane. (R. at 284.) On December 28, 2005, Plaintiff saw Johnson again and reported seeing deceased relatives and hearing occasional voices talking about her and people around her. (R. at 279, 281.) She denied

paranoia but reported experiencing continued generalized suspicion. (R. at 279.) She was assessed as being fairly stable and was advised to continue her current medication and consider maybe a mood stabilizer in the future. (R. at 280.)

In February 2006, a state agency medical consultant completed a psychiatric review technique form and a mental residual functional capacity ("RFC") for Plaintiff and concluded that she could carry out only simple instructions, make simple decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in a routine work setting. (R. at 159-75.) That same month, Plaintiff saw Johnson and reported continued depression two days of the week, seeing ghosts, and hearing voices telling her to shut up when she prayed. (R. at 275.) She denied any paranoia. (*Id.*)

The following month, Plaintiff reported to Dr. Balleza that she had stopped taking Wellbutrin because it was making her more depressed. (R. at 270-71.) Dr. Balleza then completed a mental RFC questionnaire for Plaintiff. (R. at 315-19.) He identified her symptoms as decreased energy, persistent mood disturbances, paranoid thinking or inappropriate suspiciousness, hallucinations or delusions, memory impairment, and sleep disturbance. (R. at 316.) In assessing her mental ability to perform unskilled work on a day to day basis, Dr. Balleza opined that she had limited but satisfactory abilities to remember work-like procedures, understand and remember very short and simple instructions, carry out very short and simple instructions, make simple work-related decisions, ask simple questions or request assistance, and be aware of normal hazards and take appropriate precautions. (R. at 317.) He also opined that she was seriously limited, but not precluded, from working in coordination with or in proximity to others without unduly distracting them or exhibiting behavioral extremes and responding appropriately to changes in a routine work setting. (*Id.*) He further opined that she was unable competitively to maintain attention for a two-

hour segment, maintain regular attendance and be punctual with customary and usually strict tolerances, sustain an ordinary routine without special supervision, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, and deal with normal work stress. (*Id.*)

In assessing Plaintiff's ability to perform skilled and semi-skilled work, Dr. Balleza opined that she was vocationally unable to understand and remember detailed instructions, carry out detailed instructions, set realistic goals or make plans independently of others, deal with stress of semiskilled and skilled work, interact appropriately with the general public, and maintain socially appropriate behavior. (R. at 317-18.) He also opined that Plaintiff had limited but satisfactory ability to adhere to basic standards of neatness and cleanliness, travel in unfamiliar places, and use public transportation. (R. at 318.) He concluded that Plaintiff's impairments or treatment would cause her to be absent from work more than four days a month, that her condition would be expected to last at least twelve months, and that her impairments were reasonably consistent with the symptoms and functional limitations described in the evaluation. (*Id.*)

In May that year, Plaintiff reported to Dr. Balleza that she still occasionally heard voices telling her she is stupid. (R. at 264-66.) He offered to increase her medication, but she declined because of side effect concerns. (R. at 264.) She also saw Marie Benjamin, M.A., QMHP, at Dallas Metrocare. (R. at 268-69.) During that visit, she appeared quiet and sad, and stated that she wanted to get back on medication because she was not functional without it. (R. at 268.)

In August, Plaintiff told Johnson that she sometimes missed her dosage and was non-compliant with her medication. (R. at 257.) She denied any auditory hallucinations or paranoia, and reported that her depression was "doing ok" and that she was taking care of five kids, which she

- 5 -

found stressful but also enjoyable. (R. at 260.) In November, Plaintiff saw Johnson again and reported increased depression because she had been out of medication for four days. (R. at 253.) She stated that even, while on medicine, she was seeing dead people and hearing voices telling her that she was stupid and to watch out for others. (R. at 245, 253.) She reported feeling depressed and sad with no energy when not taking her medication and stated: "As long as I take my medications, things are fine between my boyfriend and I, that's why I have to get them medications." (R. at 245.) The following month, Plaintiff told Benjamin that she heard voices and felt depressed occasionally, but felt alright generally and slept well. (R. at 239, 244.)

In January of 2007, Plaintiff told Benjamin that she tried to take her medication, was doing much better, and had a good holiday. (R. at 237-38.) Benjamin stressed the importance of remaining compliant with her medications. (*Id.*) The following month, Plaintiff saw Stephanie Landrum, BA, QMHP, at Dallas Metrocare, and reported "doing fine" on her medications. (R. at 384.) In April, Plaintiff reported to Benjamin that she was taking all her medications, and was "doing fine" and "much better." (R. at 379-80.) In June, Plaintiff told Johnson that she was doing well and much better with medication and did not have any medical issues. (R. at 372, 375.) Her chief concern was getting food stamp forms filled out. (R. at 375.) In September, Plaintiff told Benjamin that she was feeling and doing good on her medications. (R. at 366.) She appeared to be happier and had "a glow in her face." (R. at 366.) In October, Plaintiff continued to report to Johnson and Benjamin that she was doing well and much better with her current medications, had no adverse events, and wanted to continue with them. (R. at 360-61, 357.) She denied any psychosis or paranoia. (R. at 355.) In November, she reported mild depressive symptoms and mild paranoia, but denied auditory and visual hallucinations or suicidal or homicidal ideation. (*Id.*) She requested an increase in Celexa to address her depression. (*Id.*)

In February of 2009, a physician at Dallas Metrocare who had reviewed Plaintiff's medical record but had not examined her completed an assessment of her mental ability to do work-related activities. (R. at 12-14.) The physician opined that Plaintiff had a substantial loss of ability to perform uninvolved written and oral instructions; maintain attention, concentration, and attendance; perform at a consistent pace; respond appropriately to supervisors and co-workers; behave in an emotionally stable manner; deal with stress and routine changes in the workplace; and complete a normal workweek without interruption from psychologically-based symptoms. (*Id.*) The opinion stated that Plaintiff would miss more than four days of work per month due to her impairments, and her condition had been consistent in its limitations and severity since she began treatment. (*Id.*)

The record also indicates that Plaintiff complained of left shoulder pain. (R. at 329.) In August 2007, Kevin Marinus Vanden Berge, M.D., stated that she had adhesive capsulitis over the previous year. (R. at 329.) Despite receiving occupational therapy for her pain, Plaintiff reported a pain of five out of ten that increased when she reached over her head. (*Id.*) Occupational therapy reports indicated that she had approximately a 20 degree improvement in her range of motion and was unable to progress any further. (*Id.*)

### 3. Hearing Testimony

On February 25, 2008, Plaintiff, her friend, and a vocational expert ("VE") testified at a hearing before the ALJ. (R. at 432-57.) Plaintiff was represented by an attorney. (R. at 432.)

#### a. Plaintiff's Testimony

Plaintiff testified that she was forty-five years old and had a ninth grade education. (R. at 435.) She had worked as a home health provider for a while but stopped going to work because she got angry at people and couldn't work with them. (*Id.*) She was involved in drugs and prostitution at the time, and spent about $50 a day of her prostitution money on drugs. (R. at 436.) She received

drug treatment around January of 2005 and had not used any drugs since then. (*Id.*) She continued to drink a 12-pack of beer a week. (*Id.*) She had problems with her left shoulder and could not raise her arm up too far. (R. at 437.) She woke up one morning with pain in her shoulder and started going to Parkland. (*Id.*) She did not have surgery or take medication for the pain but received therapy for it. (*Id.*) There was no improvement with therapy; she could only lift about 20 pounds and felt pain when lifting her arms up. (R. at 437-38.) She had back problems and could not bend over but was not getting any treatment for that. (R. at 445-46.)

Plaintiff also testified that she had mental issues. (R. at 437.) She was paranoid and heard voices telling her that people were out to get her. (R. at 439, 446.) Her medication made her drowsy and helped her a little by sometimes keeping her from hearing voices. (R. at 438-39.) She spent about an hour a day on housekeeping, i.e., washing the dishes and cleaning up the bathroom. (R. at 440-41.) She visited her mother and daughter on a regular basis and went to Narcotics Anonymous meetings every Friday. (R. at 440, 443.) In the summer of 2006, she cared for her five grandchildren for three months. (R. at 441-42.) She was not involved in any other activities and generally spent her time watching television. (*Id.*) When on medication, she slept during the day, sometimes heard voices, wasn't able to finish her household chores, and still had mood swings. (R. at 443.) When she got stressed, she got angry, and she'd had homicidal thoughts in the past. (R. at 444.) She had also tried to commit suicide by taking a lot of pills but was not hospitalized for it. (*Id.*) She had memory problems and difficulty with numbers, and had trouble sleeping at night. (R. at 445.)

### b. *Witness' Testimony*

Plaintiff's friend, L. J. Hatnot, Jr., also testified at the hearing. (R. at 446-53.) He testified that he had been living with her for about two years, provided her financial help, and helped her

clean and wash. (R. at 447-48.) He got along with her on some days and on others she had "real bad moods," was "upset with the world," and got angry. (R. at 448, 450.) When she got upset, she would go into her room and sometimes stay there for two to three days. (R. at 451.) Her medication made her sleepy but helped her get along better with him. (R. at 450.) She had memory problems and got paranoid, and she could not work because her thinking was not that clear. (R. at 451-53.) She sometimes imagined people coming up behind her or talked to people who were not there. (R. at 453.) She went out with him to visit his sister or her mother but did not got out to eat, watch movies, or have fun. (R. at 448.) She went grocery shopping with him so he could "help her pack" and get things that they were supposed to get. (R. at 449.) He also helped her dress because she had "this real bad shake to her." (R. at 453.) Plaintiff cooked and generally spent her time watching television. (R. at 449.)

### c. *Vocational Expert's Testimony*

The VE testified that Plaintiff had no past relevant work. (R. at 453-54.) The ALJ asked the VE to opine whether there were any jobs for an individual with Plaintiff's age and education who could perform simple, repetitive work with no public contact, and could work at a sedentary or light exertion with no overhead work. (R. at 454.) The VE opined that the hypothetical individual could perform the work of a laundry worker, photocopy machine operator, and inspector. (R. at 455.) The VE al so opined that the person on most repetitive jobs could not be off task for more than ten percent of the time. (*Id.*) When Plaintiff's attorney modified the hypothetical to where the individual could not carry out very short and simple instructions, maintain attention for a two hour segment, sustain an ordinary routine without special supervision, complete a normal workweek without psychological symptoms, accept instructions and respond appropriately to criticism from supervisors, or deal with normal work stress, the VE opined that Plaintiff could not perform any

- 9 -

work in the national economy. (R. at 455-56.)

C. **ALJ's Findings**

The ALJ denied Plaintiff's application for supplemental security income by written opinion issued on August 28, 2008. (R. at 20-27.) At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since October 18, 2005, the application date. (R. at 22, ¶ 1.) At step two, she found that Plaintiff had a severe combination of impairments, including a schizoaffective disorder, a history of drug abuse and a shoulder injury. (R. at 22, ¶ 2.) At step three, she found that Plaintiff did not have an impairment or a combination of impairments that met or equaled a listed impairment. (R. at 22, ¶ 3.) In her RFC assessment, the ALJ found that Plaintiff had the ability to sustain work at the light or sedentary exertional level as defined in the regulations, i.e., "she could maintain work where she would not have to lift more than twenty pounds occasionally or ten pounds frequently." (R. at 23, ¶ 4.) She also found that Plaintiff's ability to sit, stand, or walk at work was not compromised and that "she retained the ability to perform simple, repetitive work, where she would not have to work directly with the public." (*Id.*) She found that Plaintiff had no past relevant work, but given her age, education, work experience, and RFC, could perform jobs existing in significant numbers in the economy. (R. at 26, ¶¶ 5-9.) She concluded that Plaintiff had not been disabled, as defined in the Social Security Act, since her application date . (R. at 27, ¶ 10.)

## II. ANALYSIS

A. **Legal Standards**

1. **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner

applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *Id.*

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992). The Commissioner utilizes a sequential five-step inquiry to determine whether an adult is disabled and entitled to benefits under the Social Security Act:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant

is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.**     **Issues for Review**

Plaintiff presents the following issues for review:

1. Absent reliable evidence from a treating and examining source controverting the claimant's treating physician, an ALJ may reject the opinion of a treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the six factor criteria set forth in 20 C.F.R. § 404.1527(d)(2). Did the ALJ create reversible error when she failed to conduct the specific analysis required before rejecting the opinion of Plaintiff's treating physician?

2. Final decisions of the Commissioner must be supported by substantial evidence. Is the ALJ's decision to reject the opinion of Plaintiff's treating physician supported by substantial evidence when the opinion is from a long-time treating physician, is consistent with the doctor's treatment notes, and is consistent with other evidence in the record?

(Pl. Br. at 1-2.)

**C.**     **Issue One: Reversible Error**

Plaintiff first argues that the ALJ's analysis of Dr. Balleza's opinion was in error because she failed to consider the six factors outlined in 20 C.F.R. § 404.1527(d)(2). (Pl. Br. at 8-10.) She contends that because the ALJ relied only on treatment records from Dallas Metrocare in rejecting the opinion and there were no competing opinions or functional assessments from treating or examining physicians, she was required to perform the six-factor analysis before rejecting the opinion. (Reply Br. at 1-2.) She also argues that a proper evaluation of Dr. Balleza's opinion would have led to a different decision regarding her ability to sustain work and her credibility with respect to her allegations of pain. (Pl. Br. at 10.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. § 404.1527(c)(2). Every medical opinion is evaluated regard-

- 13 -

less of its source, but the Commissioner generally gives greater weight to opinions from a treating source. 20 C.F.R. § 404.1527(d). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. 20 C.F.R. § 404.1527(d). If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* § 404.1527(d)(1)-(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, the sole responsibility for this determination rests with the ALJ. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.* A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id*. at 455-56. Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an

ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453. A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.

Here, in rejecting Dr. Balleza's opinion, the ALJ reasoned that the treatment records and notes from Dallas Metrocare showed a good response to medication in 2007 and generally showed that when Plaintiff took her medication and stayed away from drugs, she reported doing well. (R. at 26.) The medical record supports the ALJ's narrative discussion and is replete with evidence from psychiatrists, physician assistants, and qualified mental health professionals, noting that Plaintiff did well, denied paranoia or psychosis, and reported only occasional auditory or visual hallucinations when compliant with her medication.[2] (R. at 237-38, 244, 245, 253, 257, 260, 268, 280, 287, 289, 291, 355, 357, 360-61, 366, 372, 375, 384.) These professionals were part of a team at Dallas Metrocare that treated and examined her. (Pl. Br. at 11-12.) Because the ALJ discussed these competing and reliable treatment notes in rejecting Dr. Balleza's opinion, she was not required to conduct the six-factor analysis under § 404.1527(d)(2). *See Newton*, 209 F.3d at 453 (concluding that absent reliable "medical evidence" from a treating or examining physician controverting the claimant's treating specialist, an ALJ must perform six-factor analysis); *Holifield v. Astrue*, 2010

---

[2] A medical impairment that can reasonably be remedied or controlled by treatment or medication is not disabling. *See Lovelace*, 813 F.2d at 59

WL 4560524, at *3 (5th Cir. Nov. 10, 2010) (interpreting *Newton* as not requiring six-step analysis in the face of competing reliable medical evidence). Even so, she cited § 404.1527 in her narrative discussion and specifically considered some of the factors by finding that Dr. Balleza was a treating physician and that his opinion was contrary to more probative evidence and not well-supported by the treatment records. (R. at 23-26.)

While Plaintiff contends that treatment notes do not rise to the level of "competing first hand medical evidence" discussed in *Newton*, courts have specifically considered treatment notes in deciding whether an ALJ properly discounted a treating physician's opinion or was required to perform a six-factor analysis under § 404.1527(d)(2). *See e.g. Bernard v. Astrue*, 2008 WL 25490396, at *3-5 (W.D. La. June 23, 2008) (six-factor analysis not required where the ALJ discussed treatment notes conflicting with treating physician's opinion); *Lawton v. Commissioner of Social Security*, 2010 WL 4810676, at * 6 (N.D.N.Y. Nov. 2, 2010) (treating opinion not entitled to significant weight when it was inconsistent with "treatment notes"). Courts have also relied on medical records noting an improvement with medication to find that the ALJ properly assigned little or no weight to a treating physician's opinions. *See e.g. Zimmerman v. Astrue*, 288 F. App'x 931, 935-36 (5th Cir. 2008); *Nichols v. Astrue*, 2010 WL 5690390, at *10 (S.D. Miss. Apr. 2010). Because the ALJ discussed competing medical evidence from other treating physicians showing an improvement with medication, she did not err in failing to credit Dr. Balleza's opinion.

**D.    Issue two: Substantial Evidence**

Plaintiff argues that even if the ALJ's decision satisfied *Newton*, substantial evidence does not support her finding in rejecting Dr. Balleza's opinion that she does well when she takes her medication and stays away from drugs. (Pl. Br. at 11-13.) She asserts that she suffered symptoms

of psychosis, insomnia, isolation, depression, anxiety, hallucinations, delusions, paranoia, memory impairments, and suicidal and homicidal thoughts, even when she was taking her prescribed medication. (*Id.* at 12-13.) She also asserts that Dr. Balleza is a seventeen-year psychiatric specialist and part of a team of psychiatrists, physician assistants, and qualified mental health professionals who treated her, and that his opinion is both consistent with the treatment notes and with the February 2009 opinion of another doctor from Dallas Metrocare. (*Id.* at 11-12.)

Substantial evidence exists when there is enough relevant and sufficient evidence that a reasonable mind might accept as adequate to support a conclusion. *Leggett*, 67 F.3d at 564. Even if the reviewing court would reach a different conclusion based on the evidence in the record, it must defer to the ALJ if there is substantial evidence to support her conclusion. *Id.* Nevertheless, this standard of review is not simply an uncritical "rubber stamp" and "involves more than a search for evidence supporting the" ALJ's decision; the reviewing court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984). A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the ALJ's decision. *Johnson*, 864 F.2d at 343.

Here, even though some of the medical evidence reflects that Plaintiff sometimes reported symptoms while on medication (R. at 220, 245, 253, 264-66, 270-71, 279, 281, 283-85), the medical evidence also reflects that she appeared to be doing well on medication and denied any depression, paranoia, or psychosis. (R. at 237-38, 244, 245, 253, 257, 260, 268, 280, 287, 289, 291, 355, 357, 360-61, 366, 372, 375, 38.). It was entirely within the ALJ's purview to resolve this conflict because any conflicts in the evidence are for the Commissioner, not the courts, to resolve. *Masterson v.*

*Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). In resolving this conflict, the ALJ relied not only on medical reports showing a good response to medication, but also on evidence that she was able to get along better with her fiancée when she was on medication, that she was able to care for five young grandchildren for three months during the summer of 2006, and that she was the person responsible for performing most household chores in her home. (R. at 23-26.) The ALJ also relied on the state agency psychological consultant's assessment that Plaintiff had the ability to understand, remember, and carry out simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately with co-workers and supervisors, and respond appropriately to changes in a routine work setting. (R. at 26.) The ALJ was within her purview to reject the opinions of Dr. Balleza and the non-examining physician from Dallas Metrocare. As noted by the Fifth Circuit, "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Newton*, 209 F.3d at 455.[3] Finally, the ALJ relied on evidence that Plaintiff had a history of drug abuse until treatment in January of 2005. (R. at 25.) The ALJ's findings that Plaintiff does well when on medication and off drugs is supported by the substantial evidence of record.

### III. CONCLUSION

Plaintiff's motion for summary judgment is **DENIED**, Defendant's motion for summary

---

[3] The Commissioner argues that new evidence submitted to the Appeals Council may only be considered to decide whether remand is required under 42 U.S.C. § 405(g). The Fifth Circuit, however, has specifically held that evidence submitted for the first time to the Appeals Council is considered part of the record upon which the Commissioner's final decision is based, *Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005), and a court reviewing the final decision should review the record as a whole, including the new evidence, to determine whether the Commissioner's findings are supported by substantial evidence. *Higginbotham v. Barnhart*, 163 F. App'x. 279, 281-82 (5th Cir. 2006). The Court should remand only if the new evidence dilutes the record to such an extent that the ALJ's decision becomes insufficiently supported. *Id.* Here, the ALJ's decision remains sufficiently supported; like Dr. Balleza's assessment, the February 2009 assessment is contradicted by medical evidence from other treating sources.

judgment is **GRANTED**, and the final decision of the Commissioner is wholly **AFFIRMED**.

**SO ORDERED,** on this 21st day of March, 2011.

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE